**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANNE C. KAUFMANN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **METROPOLITAN LIFE INSURANCE** | : | |
| **COMPANY** | : | **NO. 08-2587** |
| | : | |

**<u>MEMORANDUM OPINION</u>**

**Savage, J.**                                                     **September 24, 2009**

In this action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), Anne C. Kaufmann ("Kaufmann") challenges Metropolitan Life Insurance Company's ("MetLife") denial of her claim for long term disability benefits. After a thorough examination of the administrative record and applying a deferential standard of review, we conclude that MetLife acted arbitrarily and capriciously when it terminated Kaufmann's disability benefits. The evidence does not support its determination that her medical condition did not prevent her from performing the duties of her own occupation. Therefore, judgment will be entered in favor of Kaufmann.

**Background**

Kaufmann was employed by Siemens Corporation as a senior project manager. As part of her employment benefits, Kaufmann was covered under a group long term disability plan, which qualified as an "employee welfare benefits plan" under 29 U.S.C. §1102. The policy gives MetLife, which both funded and administered the plan, discretionary authority to interpret the terms of the plan and to determine eligibility for benefits.

Kaufmann stopped working on May 26, 2006, after her treating physician, Daniel T. Rubino, M.D., advised her that she was unable to work.  By that time, she had unsuccessfully undergone a diskectomy and a laminectomy.  Her history revealed that she had progressive pain, disc protrusion and herniation, spinal stenosis and radiculopathy that led her to undergo several unsuccessful surgical procedures.  Ultimately, after several orthopedists and a neurosurgeon could not find a solution, she was referred to Dr. Rubino to manage her chronic pain.[1]

After initially paying disability benefits, MetLife terminated benefits effective November 9, 2007.  In its denial letter, MetLife advised Kaufmann that her physicians had failed to provide evidence that she remained disabled from performing her "own occupation."  The case manager wrote, "In conclusion, the IPC [the consultant hired by MetLife] documented that the medical information, along with your restrictions, supports a sedentary level of functionality."  R. 508.  Kaufmann contends that MetLife's conclusion that she is not prevented from performing her occupation as a senior project manager is based on inadequate medical records reviews and the mischaracterization of her light duty job as a sedentary one.

### ERISA Standard of Review

The denial of benefits under an ERISA qualified plan is reviewed using a deferential standard.  Where the plan administrator has discretion to interpret the plan and to decide whether benefits are payable, the exercise of its fiduciary discretion is judged by an arbitrary and capricious standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

---

[1]Dr. Rubino summarized Kaufmann's pertinent medical history in a chronological chart, which recounted her treatment by several specialists, multiple testing results and surgeries.  R. 581-83.

111 (1989).  A court is not free to substitute its judgment for that of the administrator. *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993).   Accordingly, in deference to the plan administrator, the decision will not be reversed unless it is "without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Id.* at 45.

Kaufmann urges us to apply a heightened standard of review using the sliding scale approach set forth in *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir. 2000). That standard has recently been rejected by the Supreme Court.  *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008).  See *Doroshow v. Hartford Life and Accident Ins. Co.*, 574 F.3d 230 (3d Cir. 2009).  The financial conflict arising from the administrator's dual role as evaluator and payor of claims does not raise the level of scrutiny.  Nevertheless, it is a factor to consider along with other factors in determining whether there has been an abuse of discretion.

The effect of a financial conflict as clarified in *Glenn* is summarized as follows:

> . . . recognizing that the conflict creates a motive to deny a claim does not raise the level of scrutiny.  It becomes a part of the review analysis.  Where there is evidence of procedural bias, the conflict factor takes on more significance. It may reinforce a finding of a procedural bias because it supplies a motive for the administrator to engage in a faulty procedure.  In other words, the presence of a conflict informs, but does not determine, the procedural inquiry.  In sum, the sliding scale approach weighs the conflict.  It does not heighten the standard of review.

*Ellis v. Hartford Life and Accident Ins. Co.*, 594 F. Supp. 2d 564, 567 (E.D. Pa. 2009).

Therefore, a heightened standard, as urged by Kaufmann, will not be applied. Nevertheless, the inherent financial conflict will be considered in the analysis of how MetLife handled the claim and made its decision.

3

Procedural bias in the review process is another factor to examine. *Kosiba v. Merck & Co.*, 384 F.3d 58, 67-68 (3d Cir. 2004). Procedural anomalies that call into question the fairness of the process and suggest arbitrariness include: relying on the opinions of non-treating over treating physicians without reason, *Kosiba*, 384 F.3d at 67-68; failing to follow a plan's notification provisions, *Lemaire v. Hartford Life & Acc. Ins. Co.*, 69 F. App'x 88, 92-93 (3d Cir. 2003); conducting self-serving paper reviews of medical files, *id.* at 93; relying on favorable parts while discarding unfavorable parts in a medical report, *Pinto*, 214 F.3d at 393-94; denying benefits based on inadequate information and lax investigatory procedures, *Friess v. Reliance Std. Life Ins. Co.*, 122 F. Supp. 2d 566, 574-75 (E.D. Pa. 2000); and, ignoring the recommendations of an insurance company's own employees, *Pinto*, 214 F.3d at 394.

**Evidence Available to MetLife**

When it considered Kaufmann's claim, MetLife had the medical records and reports from her treating physicians, test results, physical capacity evaluations completed by her physicians, the Social Security Administration Notice of Award, and her employer's job description.

As the records in MetLife's possession reflect, Kaufmann has a history of chronic back pain that has worsened and will not improve. She underwent surgeries that gave her little or no relief. She has treated with several physicians in a quest to find a solution. Yet, her condition remains insoluble.

In his narrative report of February 4, 2008, Dr. Rubino reported that his patient "cannot sit or stand for longer than 15 minutes without changing positions due to chronic pain impulses. She has severely decreased concentration ability, preventing her from

4

having gainful employment, not to mention her physical limitations." R. 413.  He concluded that "as of August 21, 2007, Nancy was no longer able to perform her pre-injury job with Siemens Corporation on a full-time sustained basis."  R. 413.  He reiterated that after having "thoroughly evaluated her clinically over numerous meetings [he was able] to confidently state that Nancy cannot adequately perform her pre-disability job."  R. 413.

Multiple diagnostic tests and several clinical examinations have confirmed the severity of her spinal pain, which is accompanied by bilateral upper and lower extremity radicular symptoms.  Dr. Richard Balderston, an orthopedic surgeon, opined that surgery could make her situation worse.  He concluded that the best course of treatment was pain management.  R. 618.  Dr. Howard Richter, a neurosurgeon, diagnosed "chronic and worsening left leg pain of uncertain origin."  R. 631.  He, too, concluded that surgery would not be a benefit and pain management was the only answer.  R. 631.

When her physicians concluded that additional surgical intervention was not an option, she was referred to a specialist in pain management.  In April, 2006, Kaufmann came under the care of Dr. Rubino, who is board certified in pain management.

In the Attending Physician Statement accompanying the Long Term Disability Claim Form, dated December 4, 2006, Dr. Rubino reported that Kaufmann could not sit, stand or walk continuously for more than a half hour; could not perform repetitively fine finger movements of her dominant right hand; could lift and carry up to twenty pounds only occasionally; and had limited ability to climb.  He concluded that she was unable to perform her job duties due to severe pain secondary to degenerative joint disease.  As a result of his findings, he advised Kaufmann to cease working at her occupation, and recommended occupational and physical therapy with pain management.  R. 578-580.

MetLife submitted documentation to Frank Nisenfeld, M.D., who reviewed the records and did not examine Kaufmann.  Using a standard Reed Review Services ("RRS")[2] form presenting questions calling for short answers, Nisenfeld agreed with the treating physicians that Kaufmann's condition will not improve and that there are "no surgical or medical answers."   R. 527.   Additionally, he opined that medications would cause functional impairment and/or safety risks.  Nevertheless, accepting MetLife's classification of Kaufmann's job as sedentary, he advised that these permanent restrictions and limitations do not prevent her from performing sedentary work.  R. 524-527.  In his report three weeks earlier, Dr. Nisenfeld had conceded that the medical information supported limitations of no lifting greater than ten pounds and no overhead work.  R. 531.  In that submission, he gave no answer to the question regarding "sedentary level functionality." R. 532.  Nor did he mention anything about Kaufmann's job or its requirements.

In its letter of November 9, 2007, terminating her benefits, MetLife advised that "the medical evidence and restrictions provided by Dr. Rubino do not identify what is preventing you from performing your sedentary occupation as a Senior Project Manager, at this time." R. 508.  It referred to the physical capacity evaluation provided by Dr. Rubino and the review by its "Independent Physician Consultant." R. 508.  MetLife concluded:  "Based on the findings of the review, there was no medical documentation to support an ongoing functional impairment that would limit your ability to perform your sedentary occupation." R. 508.  To the contrary, MetLife contended that the findings of a physical capacity evaluation "supports your ability to perform the duties of your sedentary occupation."  *Id.*

---

[2] RRS is the company MetLife engaged to refer the file to a physician for review.

Dr. Rubino then referred his patient to Wendy Wang, D.P.T., who performed a comprehensive and thorough functional capacity evaluation on December 12, 2007. The goal was to "determine [Kaufmann's] functional capabilities for returning to her own occupation as a project manager with Siemens as well as her current limitations." R. 444. Wang made an extensive inquiry into the extent of Kaufmann's job duties. Comparing Kaufmann's limitations with her job duties, Wang concluded that "based upon the results of this functional capacity evaluation, Ms. Kaufmann does not demonstrate ability to return to her previous job as a Project Manager with Siemens." R. 445.

In evaluating whether Kaufmann could perform her job duties, Wang went into detail in defining the job. She noted that as a project manager, Kaufmann was required to travel by plane or car at least once a week. She had to use a suitcase weighing at least thirty pounds. The job also requires prolonged walking, standing, driving, pulling, lifting and sitting when traveling from site to site, working in her office or participating in meetings. She also must bend, squat, crouch and kneel to set up equipment and her laptop. She must reach overhead, write and type. R. 445.

In addition to the physical requirements, the job demands include a mental component. The job requires concentration and critical thinking because it entails providing technical support for complex hospital systems. *Id.*

Wang concluded that Kaufmann is unable to carry or lift more than ten pounds; and, she cannot stoop, kneel or crouch. She has difficulty performing repetitive bending forward, carrying objects more than ten pounds, and pushing a load. Wang also noted that Kaufmann manages large-scale implementations of information systems in health care facilities such as hospitals. Her increasing pain has affected her concentration and critical

7

thinking, which is important to her job performance.  R. 445.

Kaufmann appealed MetLife's decision.  In light of MetLife's statement in the letter that "there were no current medical findings provided by your treating providers to suggest an ongoing significant functional impairment to preclude you from performing your sedentary position," Kaufmann's attorney submitted supplemental documentation and updated reports from Dr. Rubino, the doctor's most recent office notes, and Wang's functional capacity evaluation, which was completed after the original denial.

MetLife then referred its claim file to Ephraim Brenman, D.O., to conduct another record review and to complete a form questionnaire.  Dr. Brenman opined that Kaufmann was "not precluded from working full time in any capacity" and "is able to work full time, at least a sedentary level of duty."  R. 351.

In response to MetLife's request, Dr. Rubino commented on Dr. Brenman's conclusion.  He contradicted Dr. Brenman's statement that there were no objective findings.  Dr. Rubino stated clearly that the subjective complaints were confirmed by objective findings that were in the medical documentation that had been supplied to MetLife.  At the same time, he noted that "even if there were none [objective findings], this does not preclude her from having these problems."  R. 318.

On April 8, 2008, MetLife issued its decision upholding the termination of benefits as of November 9, 2007.  The written denial of Kaufmann's appeal is not part of the administrative record.  At oral argument, MetLife's counsel produced the denial letter.  It demonstrates that the decision to deny the appeal was based upon Dr. Brenman's report, a MetLife employee's characterization of Kaufmann's job as sedentary, and Kaufmann's medical records.  We shall assume that MetLife considered its entire file.

**MetLife's Reliance On Consultants' Opinions**

In light of MetLife's reliance on the opinion of its hired consultant, we shall examine how it viewed his brief report in comparison to Kaufmann's treating physicians' detailed findings and opinions. In doing so, we look to the bases of their respective conclusions, the extent of their analyses, the information available to them, and their treatment of that information.

If MetLife accorded undue deference to the opinion of its consultant who never examined Kaufmann, or gave it, without a sufficient basis, substantially more weight than a treating physician's opinion, a procedural anomaly arises. *Kosiba*, 384 F.3d at 67-68. If the consultant's opinion is not founded on reliable evidence, the plan administrator may not give it conclusive effect. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)

When the Supreme Court held, in *Nord*, that the rule giving special deference to a treating physician's opinion in Social Security disability cases did not apply to ERISA disability claims, it did not rule that a treating physician's opinion is never entitled to deference over a retained consultant's opinion. 538 U.S. at 829-30. Rather, it instructs only that "courts have no warrant to require administrators *automatically* to accord special weight to the opinions of a claimant's physician," and that courts may not "impose on plan administrators a discrete burden of explanation when they credit *reliable* evidence that conflicts with a treating physician's evaluation." *Id.* at 834 (emphasis added). Thus, *Nord* did not grant a plan administrator a license to disregard or only cursorily consider the opinions of the physicians who were familiar with and treated the insured.

The *Nord* Court acknowledged that a treating physician in many cases has a better opportunity to know and observe the patient than do consultants retained by a plan. *Id.* at

9

832.   Nevertheless, it concluded that deference may not be warranted when a treating physician had only a short relationship with the patient or when the plan's retained consultant is a specialist and the treating physician is a general practitioner.  *Id.*

The Supreme Court's instruction does not authorize a plan to give conclusive weight to an unreliable report of a non-treating physician.  Nor does it insulate plan decision makers whenever they reject a treating physician's opinion in favor of a consultant's opinion.  *Nord*, 538 U.S. at 834 ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

In summary, if the consultant's conflicting opinion is based on reliable evidence, it can support a determination contrary to that of a treating physician, especially if the consultant is a specialist and the treating physician is not.  In such a case, the plan need not explain why it chose the consultant's opinion over the treating physician's.  Conversely, where the treating physician is a specialist who has treated his patient over time and the insurer's non-specialist consultant has not, the plan may be required to explain why it relied on its consultant's evaluation and disregarded or only superficially considered the treating physician's findings.

Often the consultant does not examine the insured.  Instead, he only reviews the medical records provided by the plan administrator.  In such a case, the absence of an examination is a factor in analyzing the opinions of the consultant and the treating physician.

There is no obligation on the disability insurer to have an insured examined by a physician before deciding entitlement to continuing disability benefits.  Consequently, the failure to conduct an examination does not render the decision arbitrary.  In some cases,

10

where the documentary evidence is sufficient, an examination may be unnecessary.  In other cases, where the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits.  In that case, without an adequate explanation for accepting the non-examining consultant's opinion over the treating physician's, the insurer's evidence may be deemed unreliable.

Here, MetLife relied on two physicians who conducted records reviews and did not examine Kaufmann.  Both concluded that Kaufmann was able to perform a sedentary job at Siemens.  Neither displayed an understanding of the job demands.  One agreed and the other disagreed with Kaufmann's several treating physicians that she had restrictions and limitations.  Dr. Brenman did not give any rationale, other than a claimed lack of objective findings, for his contradicting or ignoring the treating physicians.  He did not address Dr. Wang's functional capacity evaluation that had been prepared after a comprehensive and thorough objective testing session.

After receipt of Dr. Wang's report, MetLife did not request Dr. Nisenfeld, who had agreed with Kaufmann's doctors' diagnoses and impairment findings, to review it.  Instead, it referred the case to Medical Consultants Network, Inc., which assigned it to Dr. Brenman who gave Dr. Wang's report scant consideration.  He noted only that Dr. Wang found "the patient was reliable.  The patient was not safe to return to her previous job."  R. 349.  He either did not consider or ignored Dr. Wang's detailed clinical findings and test results.  He made no attempt to reconcile Dr. Wang's objective findings with his contrary conclusion that "there is a lack of objective findings to support the patient's ongoing subjective

symptoms to preclude the patient's ability to work full time."  R. 350.

Significantly, neither consultant analyzed Kaufmann's job requirements.  Yet, they opined that her impairments did not prevent her from meeting them.  Both accepted, without any investigation or evaluation, that her job was sedentary.  There is no acknowledgment of Dr. Wang's detailed description of the job that Kaufmann actually performed.  Nothing in their form reports shows that either one had an understanding of her job requirements.  Hence, they did not compare her limitations to her actual job requirements.

Dr. Nisenfeld was never presented with a job description.  He never interviewed Kaufmann, her employer or anyone to learn what the job required.  Instead, he accepted MetLife's general description that it was sedentary.  R. 524.

Dr. Nisenfeld's acceptance of MetLife's characterization of Kaufmann's job as sedentary is critical to his opinion that Kaufmann can perform her job.  R. 524.  He acknowledged that her medical care and treatment was appropriate, and that there are no surgical or medical answers.  R. 526, 527.  He concluded that the functional limitations are supported by the medical information.  R. 525.  In a critical finding, he agreed that she is incapable of lifting over ten pounds and doing overhead work.  R. 525.

Obviously, if the job was more than sedentary, Dr. Nisenfeld's conclusion is meaningless because Kaufmann's lifting impairment limits her to sedentary work.  Even if it were sedentary, his opinions are not supported by any analysis of the findings of the treating physicians.  He did not have the benefit of Dr. Wang's comprehensive physical capacity evaluation.

After Kaufmann appealed the decision to terminate her benefits, MetLife referred

12

the file to another doctor, Dr. Brenman, for a second records review.  After listing each of the records he had been supplied, Dr. Brenman answered three questions apparently posed by MetLife.  Citing "a lack of objective findings to support the patient's ongoing subjective symptoms to preclude the patient's ability to work full time," he opined that Kaufmann "does not have any functional limitations that reduce [her] ability to work full time."  R. 350.  He concludes that she is "able to work full time, at least a sedentary level of duty."  R. 351.  In fact, contrary to every other physician, including MetLife's other consultant, Dr. Brenman goes so far to say that she is "not precluded from working full time in any capacity."  *Id*.

MetLife cannot rely on Dr. Brenman to support its decision that Kaufmann could perform her regular occupation because he did not address the issue.  He concluded that Kaufmann did not have any functional limitations that "reduce the patient's ability to work full time."  R. 350.  Nowhere does Dr. Brenman discuss Kaufmann's ability to perform her job as a senior project manager at Siemens.  Instead, without any real analysis and in contradiction to Dr. Nisenfeld's opinion, he reported that Kaufmann "is not precluded from working full time *in any capacity*."  R. 351 (emphasis added).  There is nothing in his report that indicates that he knew and considered the physical and mental requirements of Kaufmann's occupation.

Dr. Brenman's opinion does not depend on his understanding of Kaufmann's job description.  From his perspective, it did not matter what her job required.  In the face of plenty of documented evidence to the contrary, he simply concluded she has no limitations and can work "full time in any capacity."  R. 351.  His opinion is based solely on his declaration that there are "no objective findings to support the patient's ongoing subjective

symptoms . . . ."  R. 350.

Dr. Brenman's opinion regarding Kaufmann's impairments and limitations conflicts with Dr. Nisenfeld's, MetLife's other consultant, and Kaufmann's treating physician. MetLife did not attempt to reconcile the conflicting opinions.  Instead, without explanation, MetLife accepted Dr. Brenman's conclusion, while ignoring those opinions and findings that contradicted it.

MetLife's acceptance of Dr. Brenman's bare conclusion over the contrary detailed findings of Kaufmann's treating physicians and its failure to explain its choosing one consultant's opinion over its other consultant's opinion suggests that it was searching for anything to justify denying the claim.

### MetLife's Treatment of Kaufmann's Occupation and Physical Demands

Disability is defined in the Plan as:

> "'disabled' or 'disability' means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from the doctor on a continuing basis; and

> 1.    During your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your capital Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

> 2.    After the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.  R. 123.

14

"Own Occupation" is defined as:

> [T]he activity that you regularly perform and that serves as your source of income.  It is not limited to the specific position you held with your Employer.  It may be similar activity that could be performed with your Employer or any other employer.  R. 124.

The Plan's definition of "own occupation" focuses on the activity and not the title of the job.  It is what the employee does that defines the job.  A job that requires the same activity, regardless of the title, meets the definition.

Siemens provided MetLife with Kaufmann's job description as a Consulting Project Manager.  In addition to listing the various job activities, the description recited the physical demands.  Among them were "frequently lifting 10 lbs. and carrying 10-15 lbs. frequently with bending occasionally, crouching continuously, climbing stairs occasionally, driving 2 hours per day, sitting 7 hours, standing 1 hour and walking one half hour per day."  R. 52.  These physical demands fit the category of light duty. See 20 C.F.R. § 416.967 (b).  Nevertheless, MetLife categorized Kaufmann's job as sedentary.

An occupation is sedentary where it only requires occasional, not frequent, lifting up to ten pounds.  20 C.F.R. § 416.967 (a).  Light work requires lifting or carrying of up to ten pounds frequently. 20 C.F.R. § 416.967 (b).  Even when the weight is only a negligible amount, a job is considered light work when it requires walking or standing to a significant degree. *Id.*

Notwithstanding Siemens' description of the job, MetLife chose the definition of "project manager" from the Dictionary of Occupational Titles,[3] which is rated as sedentary.

_____

[3] The Department of Labor classifies various jobs in its Dictionary of Occupational Titles, 4th Ed., rev. 1991.

MetLife used that job title to conclude that Kaufmann's job required lifting and pulling up to ten pounds "occasionally" and involving standing or walking for only brief periods of time. Yet, MetLife knew that Kaufmann's job required "frequent lifting 10 lbs. and carrying 10-15 lbs. frequently,"  R. 52.  These demands fit the classification of light work.  Again, ignoring these demands, MetLife notes that the description "appears to most closely match the DOT title of project director, DOT code 198.117-030," a sedentary occupation.

Instead of matching the physical demands of Kaufmann's job to a job title, MetLife selected a job title from the DOT that appeared similar to the Siemen's title of senior project manager and then applied the demands of that title.  In effect, it disregarded the actual physical demands of Kaufmann's job in defining the job.

MetLife offers no explanation why it disregarded the actual physical demands of Kaufmann's job and defined it as sedentary based upon the job title only.  Despite the Plan's definition that focuses on the activity and not the title, it chose a job title, project director, that was less demanding than Kaufmann's job.

MetLife's mischaracterization of Kaufmann's job as sedentary skewed its consultants' reviews.  It resulted in opinions that rest on a faulty foundation.  When MetLife sought Dr. Nisenfeld's opinion as to Kaufmann's ability to do her job given the restrictions and limitations described by her physicians, it did not provide him with a description of the actual physical demands of the job.  It advised him that the job was sedentary. Dr. Nisenfeld accepted this characterization without question.  Thus, his opinion is based on his understanding that Kaufmann's job was a sedentary one.

In his original report, Dr. Nisenfeld advised that the medical records supported restrictions and limitations as prescribed by Kaufmann's doctors.  He did not answer the

16

question: "Does the medical information support sedentary level functionality."

In a report issued three weeks later, Dr. Nisenfeld reiterated that the medical records confirmed that Kaufmann could not lift greater than ten pounds and could do no overhead work, limitations restricting her to sedentary work.  In the second report, he answered the question he had avoided in his first report, stating that "the medical information supports sedentary level functionality." R. 526.  In the preamble to his second report, he stated that Kaufmann was a Senior Project Manager and that "her job is sedentary."  R. 524.  He was provided that classification by MetLife and not by any independent investigation of his own.

Likewise, Dr. Brenman had no comprehension of the duties and the physical demands of Kaufmann's job.  He assumed her job was sedentary.  To the extent he concluded she can do sedentary work, his opinion is meaningless because her job, as defined by its physical demands, was not sedentary, but light work.  Apparently, it did not matter to him whether the job was classified as sedentary or light work because he opined she could "work full time in any capacity." R. 351.  To the extent he found her capable of any kind of full time employment, his opinion cannot stand against all the other evidence in MetLife's file, including that of its other consultant, regarding her limitations and impairments.  His opinion, especially in the face of this other evidence, is not supported by any evidence, let alone substantial evidence.

MetLife's reliance on Dr. Brenman's opinion and its rejection of the opinions of those who treated and examined Kaufmann raises a suggestion that MetLife's review was selective and it was inclined to grasp upon any opinion to support its decision to deny benefits.

**MetLife's Selectivity**

Substantial evidence exists when the record contains sufficient evidence that would lead a reasonable person to agree with the administrator's decision. *Diaz v. Comm'r of Social Security*, _ F.3d _ 2009 WL 2449513, at *3 (3d Cir. 2009). Dr. Brenman's assumption was not supported by substantial evidence. He concludes that there were no objective findings to support Kaufmann's subjective complaints. Yet, there is ample evidence of objective findings. Kaufmann underwent a multitude of tests that corroborated her suffering from conditions causing chronic pain that resulted in her disability. Indeed, MetLife's other consultant, Dr. Nisenfeld, did not question her pain, limitations or impairments. Dr. Brenman does not challenge these findings. Instead, he ignores them and states they do not exist.

In the context of the record, MetLife's decision to credit Dr. Brenman's unreliable report over multiple treating physicians' evaluations was not reasonable and not supported by substantial evidence. We recognize that we cannot automatically defer to the treating physicians in this ERISA case. However, where a plan defers to a two-paragraph non-treating physician's opinion over multiple credible treating physicians' reports, without analysis and explanation, its decision is affected by a procedural bias.

MetLife's selectivity in what medical evidence it accepted and what it rejected casts doubt on the fairness of the decision making process. MetLife did not rationally explain why it refused to accept the treating physicians' findings and opinions, and failed to submit the additional evidence to Dr. Nisenfeld and instead sought a new report from Dr. Brenman.

**Conclusion**

18

Considering the administrative record and the procedural anomalies, we find that MetLife's decision to deny benefits is not supported by substantial evidence.  Instead, it was arbitrary and capricious.  Therefore, MetLife's motion for summary judgment will be denied and Kaufmann's motion for summary judgment will be granted.[4]

---

[4] A court has discretion in fashioning a remedy in an ERISA benefits case.  It may either remand the case to the administrator for a reevaluation or retroactively award benefits.  Remand is unnecessary where the insured would have received benefits had the plan acted appropriately.  See *Addis v. The Limited Long-Term Disability Program*, 425 F. Supp. 2d 610 (E.D.Pa. 2006), aff'd 268 Fed Appx 157 (3d Cir. 2008).